FILED
COURT OF APPEALS
DIVISION II

2014 SEP 16 AM 10: 00

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| VIKING BANK, | No. 44925-1-II |
| Respondent, | |
| v. | |
| FIRGROVE COMMONS 3, LLC, | PUBLISHED OPINION |
| Appellant. | |

MAXA, J. — Firgrove Commons 3, LLC (Firgrove) appeals the trial court's declaratory judgment that its tenant, Viking Bank, does not owe management fees Firgrove incurred with respect to its lease with Viking Bank. Firgrove argues that Viking Bank is responsible for the management fees because the lease provides for "triple net" rent,[1] and states that the tenant will pay all costs and expenses incurred in connection with the leased property. Clerk's Papers (CP) at 16. However, we hold that when viewed as a whole, the lease does not require Viking Bank to pay management fees. Accordingly, we affirm.

## FACTS

Firgrove owns a parcel in a four-parcel business development in Puyallup known as the Firgrove Commons Shopping Center. A fast food restaurant and an office/retail building occupy

---

[1] The trial court stated that "[a] triple net lease means the tenant pays the taxes, the insurance, costs of repair, and costs of maintenance." CP at 102.

two of the other parcels in the shopping center, and the fourth parcel remains undeveloped. The four parcels share common areas, including areas used for ingress and egress.

In 2008, Firgrove entered into a long term commercial ground lease of the parcel with Viking Bank. As contemplated in the lease, Viking Bank constructed a building on the leased premises for use as a retail banking facility. In March 2010, Viking Bank moved into its newly constructed building and began paying rent to Firgrove.

The lease provides that Viking Bank will be responsible for the base annual rent. The lease states that the rent shall be paid as " 'triple net' rent without deduction or offset." CP at 102. It further explains that

> [i]t is the intent of the parties, except as is otherwise provided in this Lease, that Base Annual Rent provided to Landlord shall be absolutely net to Landlord, and Tenant shall pay all costs, charges, insurance premiums, taxes, utilities, expenses, and prorated share of maintenance for common area CAM expenses, and assessments of every kind and nature incurred for, against, or in connection with the Ground Leased Premises and Property.

CP at 102.

Under the lease Viking Bank also must pay a portion of the common area maintenance (CAM) expenses. The lease defines "CAM Expenses" as "the reasonable costs and expenses of maintaining or repairing any entrances to or sidewalks within [the development]." CP at 16. But Viking Bank otherwise is responsible for maintaining the non-common leased premises. Section 7.1 of the lease expressly provides that Viking Bank will maintain its leased premises at its own expense. And CAM expenses do not include the cost or expense of snow removal, landscaping, or other work done on or around the leased premises itself. Further, the lease requires Viking

2

Bank to pay the parcel's property taxes directly to Pierce County and either pay or cause to be paid all utilities used on the premises, including sewer and trash disposal.

Without consulting Viking Bank, Firgrove hired a property manager to manage the Firgrove Commons Shopping Center. The property manager maintained the common areas through its employees or hired independent contractors to do maintenance, and billed the tenants/owners for their shares of CAM expenses. The property manager also negotiated a contract with a company to do sweeping and snow/ice removal for the common area driveways. The property manager performed other administrative functions regarding Viking Bank's lease, such as billing Viking Bank for monthly rent, property taxes, and sewer charges. Firgrove agreed to pay the property management company a fee equal to five percent of Viking Bank's rent for work relating to Viking Bank's lease.

In November 2010, the management company (on behalf of Firgrove) billed Viking Bank for the five percent property management fee. Viking Bank refused to pay the fee. Viking Bank then filed a complaint for declaratory judgment seeking the trial court's determination of whether or not it owed Firgrove the management fees under the terms of the lease. Firgrove filed a counterclaim alleging that Viking Bank breached the lease by failing to pay the management fee.

After a one-day bench trial, the trial court concluded that the lease does not expressly or implicitly require Viking Bank to pay the management fee Firgrove incurred for the leased property, and that Viking Bank was not in breach of the lease. Firgrove appeals.

## ANALYSIS

The parties dispute whether the terms of the lease require Viking Bank to reimburse Firgrove for the fee it paid the property management company for work relating to Viking

3

Bank's lease. The lease does not expressly address responsibility for management fees. Viking Bank argues that the lease does not contemplate management fees because the parties intended the bank to manage its own premises. It further argues that Firgrove's interpretation creates uncertainty by allowing the landlord to alter the terms of the agreement by unilaterally hiring a third party to perform administrative tasks that it could do itself and negotiating a management fee that is not related to the time, efforts, or costs expended for the work performed on the leased premises. Viking Bank contends that if Firgrove intended to hire a management company and pass along that cost to the tenant, it should have negotiated that term and specifically addressed it in the lease.

Firgrove argues that the plain language of section 3.5 of the lease requires Viking Bank to pay the management fee. Firgrove emphasizes that under section 3.5, the rent Viking Bank pays will be "triple net" and "absolutely net" to Firgrove. Br. of Appellant at 15. Firgrove argues that if Viking Bank does not pay the management fee, the rent will not be absolutely net. Further, Firgrove points out that section 3.5 expressly provides that Viking Bank must pay "all costs, charges . . . expenses . . . of every kind and nature incurred . . . in connection with the Ground Leased Premises and Property," and argues that the management fee is such an expense. CP at 16.

We agree with Viking Bank and hold that the lease does not require Viking Bank to reimburse Firgrove for the management fee it unilaterally incurred for its own benefit and convenience.

A.    STANDARD OF REVIEW

When a court relies on inferences drawn from extrinsic evidence, interpretation of a contract is a question of fact. *Berg v. Hudesman*, 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990). But contract interpretation is a question of law when the interpretation does not depend on the use of extrinsic evidence. *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co.*, 176 Wn.2d 502, 517, 296 P.3d 821 (2013); *see also Mut. of Enumclaw v. USF Ins. Co.*, 164 Wn.2d 411, 424 n.9, 191 P.3d 866 (2008) (noting that when a contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law); *Keystone Masonry, Inc. v. Garco Const., Inc.*, 135 Wn. App. 927, 932, 147 P.3d 610 (2006) ("[a]bsent disputed facts, the legal effect of a contract is a question of law that we review de novo.").

We review a trial court's decision following a bench trial by asking whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law. *Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012). Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). The application of the law to the facts is a question of law that this court reviews de novo. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 441, 191 P.3d 879 (2008). Therefore, we review the trial court's conclusions of law pertaining to contract interpretation de novo. *See Mitchell v. Wash. State Inst. of Pub. Policy*, 153 Wn. App. 803, 814, 225 P.3d 280 (2009).

Here, the trial court heard testimony and considered documentary evidence before interpreting the lease provisions. However, the court did not rely on any extrinsic evidence as contemplated in *Berg* in interpreting the lease. Accordingly, we interpret the lease as a matter of law based on a de novo standard of review.

B.     PRINCIPLES OF CONTRACT INTERPRETATION

The primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Washington follows the "objective manifestation theory" of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst*, 154 Wn.2d at 504. And we view the contract as a whole, interpreting particular language in the context of other contract provisions. *See Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 669-70, 15 P.3d 115 (2000).

To assist in determining the meaning of contract language, we also apply the "context rule" adopted in *Berg*, 115 Wn.2d at 666-69. This rule allows examination of the context surrounding a contract's execution, including the consideration of extrinsic evidence to help understand the parties' intent. *Hearst*, 154 Wn.2d at 502. However, extrinsic evidence is to be used " 'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.' " *Hearst*, 154

6

Wn.2d at 503 (emphasis in original) (quoting *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999)).

If a contract provision's meaning is uncertain or is subject to two or more reasonable interpretations after analyzing the language and considering extrinsic evidence (if appropriate), the provision is ambiguous. *See Jensen v. Lake Jane Estates*, 165 Wn. App. 100, 105, 267 P.3d 435 (2011). We generally construe ambiguities against the contract's drafter. *Pierce County v. State*, 144 Wn. App. 783, 813, 185 P.3d 594 (2008); *see also Johnny's Seafood Co. v. City of Tacoma*, 73 Wn. App. 415, 420, 869 P.2d 1097 (1994) (noting that ambiguities in lease drafted by a lessor are resolved in favor of the lessee). However, if the drafter is unknown or if the parties drafted the contract together, we will adopt the interpretation that is the most reasonable and just. *See Berg*, 115 Wn.2d at 672.

C.    ANALYSIS OF LEASE SECTION 3.5

The crucial provision in the lease is section 3.5, which states:

> All Base Annual Rent payable hereunder shall be paid as *"triple net" rent* without deduction or offset. It is the intent of the parties, except as is otherwise provided in this Lease, that Base Annual Rent provided to Landlord shall be *absolutely net* to Landlord, and Tenant shall pay all costs, charges, insurance premiums, taxes, utilities, expenses, and prorated share of maintenance for common area CAM expenses, and assessments of every kind and nature incurred for, against, or in connection with the Ground Leased Premises and Property.

CP at 16 (emphasis added). This provision requires an analysis of the meaning of "triple net" rent and "absolutely net" rent.[2]

---

[2] As noted above, in interpreting this contract language we are allowed to consider extrinsic evidence regarding the context surrounding the contract's execution. Here, the trial court noted no evidence that provided any meaningful assistance in ascertaining the parties' intent regarding the meaning of these terms.

The *Washington Real Property Deskbook* defines a "triple net" lease as one in which the tenant pays all expenses (property taxes and insurance), maintenance, and utilities. 2 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK SERIES: REAL ESTATE ESSENTIALS § 18.1(2), at 18-5 (4th ed. 2009) (DESKBOOK). *Black's Law Dictionary* defines a triple net lease as one in which "the lessee pays all the expenses, including mortgage interest and amortization, leaving the lessor with an amount free of all claims." BLACK'S LAW DICTIONARY 972 (9th ed. 2009). In the only published Washington case discussing triple net leases, our Supreme Court stated without citation that a triple net lease means "the tenant bears the operating expenses." *See Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 370 n.1, 798 P.2d 799 (1990). The *Deskbook* defines an "absolute net" lease as one that implies that the landlord is to have no expense associated with the property. § 18.1(2). No Washington cases discuss the meaning of "absolutely net" rent. None of these definitions specifically mention management fees in connection with a triple net lease or an absolute net lease.

Firgrove points out that the common understanding of a triple net lease is a broad shifting of expenses from the landlord to the tenant. It argues that the characterization of the lease as "triple net" or "absolute net" demonstrates that the parties intended to allocate to the tenant all the expenses in connection with the leased property, leaving the landlord with no expenses. According to Firgrove, the plain language of section 3.5 supports this conclusion in that it requires the tenant to pay all costs, charges, and expenses "of every kind and nature" incurred in connection with the leased property. CP at 16. Firgrove argues that under this analysis, Viking Bank must be required to pay management fees.

We disagree, and hold that that the language of section 3.5 and the contract as a whole does not support Firgrove's position for three reasons. First, many of the management company's duties – such as collecting rent, property taxes, and sewer charges from Viking Bank – relate to administration and enforcement of the lease provisions. But section 3.5 requires the tenant to pay expenses "incurred for, against, or in connection with the Ground Leased Premises and Property." CP at 16. In other words, the tenant must pay only those expenses incurred in connection with the leased *property*, not expenses incurred in connection with the *lease*. The management company's collection activities involved expenses in connection with the lease but not the leased property. Therefore, they are not within the scope of section 3.5.

Second, section 3.5 states a general term (all costs, charges, and expenses) followed by specific terms (insurance premiums, taxes, utilities, prorated share of maintenance for CAM expenses, and assessments of every kind). Under the maxim ejusdem generis, a general term used in conjunction with specific terms will be deemed to include only those things that are in the same class or nature as the specific ones. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 151, 3 P.3d 741 (2000) (discussing the maxim as a rule of statutory interpretation); *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 590-91, 964 P.2d 1173 (1998) (discussing the maxim as a principle of contract interpretation). Here, payment of the expenses specifically listed in section 3.5 is necessary for the tenant's continued use and occupancy of the leased premises. As such, payment of these expenses benefits the tenant. But payment of the expense for *collecting* rent, taxes, and utility payments is not necessary for continued use and occupancy, and did not benefit Viking Bank. Instead, hiring a management company to collect these

payments was for Firgrove's own benefit and convenience. Therefore, expenses relating to the management company's collection activities are not within the scope of section 3.5.

Third, other lease provisions show that the parties contemplated that Viking Bank, and not Firgrove or its agents, would assume responsibility for many of the duties the management company undertook. Specific lease provisions require Viking Bank to (1) pay rent without notice or demand (section 3.1); (2) pay the property taxes directly to the taxing authority and retain a tax service to notify landlord the taxes have been paid (section 3.2); (3) pay all utilities including water, heat, gas, electricity, trash disposal, sewers (section 3.3); (4) carry comprehensive liability insurance, fire and extended coverage property insurance (section 11.1, .2); and (5) maintain the leased premises (section 7.1). In other words, under the lease Viking Bank is contractually obligated to act as the "manager" of the leased property. Interpreting section 3.5 as requiring Viking Bank to pay a property management company to duplicate its own management responsibilities would be inconsistent with the other lease provisions.

Based on this analysis, we hold that under section 3.5 Viking Bank is not required to pay the management fees to the extent they relate to collecting rent, property taxes, and sewer charges from Viking Bank, or any other lease administration activities.

However, Firgrove argues that the management company's services are needed in order to provide common area maintenance. Both sections 3.4 and 3.5 expressly require Viking Bank to pay CAM charges, which are the "reasonable costs and expenses of maintaining or repairing any entrances to or sidewalks within [the development]." CP at 16. Viking Bank does not dispute this obligation, and in fact has paid all CAM charges for which it has been billed. As a

result, if the management company's services are necessary for common area maintenance, Viking Bank is required to pay expenses associated with those services.

Here, Firgrove made no effort to allocate a portion of the management company's fee to CAM charges, and instead charged Viking Bank a percentage of the rent for all management services. Based on the analysis above, we hold that Viking Bank had no obligation to pay that unallocated percentage.

The trial court concluded that Viking Bank was not required to pay the charged management fee. Accordingly, the trial court entered a declaratory judgment in favor of Viking Bank. We affirm the trial court's ruling.

D.     ATTORNEY FEES ON APPEAL

Firgrove and Viking Bank both request reasonable attorney fees on appeal based on section 18.8 of the lease which provides that the prevailing party is entitled to reasonable attorney fees.[3] When a contract provides for an attorney fee award in the trial court, the party prevailing before this court may seek reasonable attorney fees incurred on appeal. *First-Citizens Bank & Trust Co. v. Reikow*, 177 Wn. App. 787, 799, 313 P.3d 1208 (2013); *see also* RAP 18.1. Here the lease provides that "[i]f either party retains an attorney to enforce or interpret this Lease, the prevailing party shall be entitled to recover . . . reasonable attorneys' fees and costs incurred through litigation, bankruptcy proceedings, and all appeals." CP at 31.

As the prevailing party, Viking Bank has a contractual right to recover its attorney fees and costs under the terms of the lease. Accordingly, we hold that Viking Bank is entitled to

---

[3] The parties stipulated that their claims for attorney fees in the trial court would be determined after our decision.

11

44925-1-II

recover its attorney fees and costs on appeal. We deny Firgrove's request for attorney fees and costs because it is not the prevailing party.

We affirm.

MAXA, J.

We concur:

JOHANSON, C.J.

MELNICK, J.

12