FILED
COURT OF APPEALS
DIVISION II

2015 MAR 10 AM 8: 40

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHAELS STORES, INC., a Delaware corporation, | No. 46071-8-II |
| Respondent, | |
| v. | |
| RPAI LAKEWOOD, L.L.C., f/k/a INLAND WESTERN LAKEWOOD, L.L.C., a Delaware limited liability company, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — RPAI Lakewood LLC (RPAI) appeals the superior court's order granting summary judgment to its tenant, Michaels Stores, Inc. (Michaels), in this declaratory judgment action. Because the commercial lease provisions at issue are unambiguous and show that RPAI's termination notice was untimely, we affirm the order granting summary judgment and the final judgment awarding damages and attorney fees to Michaels. We also award Michaels attorney fees on appeal.

## FACTS

On August 10, 2001, Michaels entered into a lease agreement with RPAI's predecessor for space in the Lakewood Towne Center, a retail shopping center located in Lakewood. The lease

was due to expire on February 28, 2012, but contained options for three five-year extensions. By exercising the first of these options, Michaels extended the lease to February 28, 2017.

Section 16.3 of the lease contains an "On-Going Co-Tenancy Requirement." Clerk's Papers (CP) at 37, 233. Under this provision, RPAI must lease at least 70 percent of the total square footage of the shopping center to "Anchor Tenants," as defined in the lease. CP at 37, 233. If RPAI cannot do so for any six-month period, Michaels can choose to pay an "Alternative Rent" in lieu of the higher "Minimum Rent" until RPAI satisfies the co-tenancy requirement. CP at 37-38, 233-34.

Section 16.3 allows either party to terminate the lease following nonsatisfaction of the co-tenancy requirement. It describes Michaels' right to terminate as follows:

> In addition to the rights of Tenant to pay "Alternative Rent", if . . . non-satisfaction of the On-Going Co-Tenancy Requirement shall continue for a period of twelve (12) months beyond the initial failure to meet the On-Going Co-Tenancy Requirement and for so long as such non-satisfaction shall continue, . . . Tenant shall have the right to terminate this Lease by sixty (60) days' written notice delivered to Landlord.

CP at 234. Section 16.3 then describes RPAI's right to terminate:

> Landlord shall likewise have a right to terminate this Lease, at the end of the fourteenth (14th) month following the initial nonsatisfaction of the Co-Tenancy Requirement by giving sixty (60) days prior written notice to Tenant of the termination.

CP at 234. Upon receiving such notice, section 16.3 provides that Michaels may avoid termination by agreeing to resume paying the full minimum rent.

Section 16.3 was triggered when Gottschalks, a defined anchor tenant, closed its store at the shopping center in May 2009. Six months later, when RPAI had failed to obtain another anchor

tenant, Michaels informed RPAI that it would begin paying the lower alternative rent.[1] By May 2010, RPAI still had not obtained another anchor tenant. But neither party exercised its right to terminate the lease at that time.

On December 14, 2012, RPAI notified Michaels that it would terminate the lease in 60 days unless Michaels agreed to resume paying the minimum rent. By that time, Michaels had extended its lease to February 2017. Michaels responded that it would keep paying the alternative rent until RPAI satisfied the co-tenancy requirement, but RPAI refused to rescind its termination notice. Beginning January 30, 2013, Michaels began paying the minimum rent under protest, reserving its right to pursue available remedies against RPAI.

Michaels subsequently filed a declaratory judgment action seeking a determination that RPAI failed to timely exercise any right it had to terminate the lease under section 16.3. Michaels also sought an award of damages for the difference between the minimum rent it had been paying under protest and the alternative rent. RPAI responded that the lease allowed it to give notice of termination at any time after the end of the 14th month following the initial co-tenancy failure. RPAI agreed with Michaels that the end of the 14th month was July 31, 2010.

Michaels moved for summary judgment, arguing that the language of section 16.3 did not give RPAI an ongoing right to terminate the lease. RPAI responded that Michaels' interpretation was unfair and that section 16.3 granted the landlord and tenant similar termination rights.

The superior court agreed with Michaels' interpretation: "I think [RPAI] did have a right to terminate [the Lease] at the end of the 14th month. They waived that, and I'm going to grant

---

[1] The alternative rent is approximately one third of the minimum rent.

summary judgment to Michaels on . . . the language in the contract." Report of Proceedings (RP) at 36. The superior court entered an order granting summary judgment in favor of Michaels, prohibiting RPAI from terminating the lease, and awarding Michaels damages in the amount of the difference between the alternative rent and the minimum rent it had been paying since January 2013. The superior court also entered final judgment in favor of Michaels for $279,466.56, including an award of attorney fees.

RPAI appeals, arguing that issues of fact remain concerning the meaning of the lease's termination provisions and that this court should reverse the order of summary judgment and remand this case for trial.

## ANALYSIS

### A.    STANDARD OF REVIEW

Our review on summary judgment is de novo. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 501, 115 P.3d 262 (2005). The moving party has the initial burden to show that there is no genuine issue as to any material fact. *Yakima Fruit & Cold Storage Co. v. Cent. Heating & Plumbing Co.*, 81 Wn.2d 528, 530, 503 P.2d 108 (1972). If the moving party satisfies its burden, the nonmoving party must present evidence demonstrating that material facts are in dispute. CR 56(e); *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). If the nonmoving party fails to do so, summary judgment is appropriate. CR 56(e); *Vallandigham*, 154 Wn.2d at 26.

4

The interpretation of a contract provision is a question of law when the interpretation does not depend on the use of extrinsic evidence, or when only one reasonable inference can be drawn from the extrinsic evidence. *Lokan & Assocs., Inc. v. Am. Beef Processing, LLC*, 177 Wn. App. 490, 499, 311 P.3d 1285 (2013). "If a contract is unambiguous, summary judgment is proper even if the parties dispute the legal effect of a certain provision." *Voorde Poorte v. Evans*, 66 Wn. App. 358, 362, 832 P.2d 105 (1992).

B.    INTERPRETATION OF THE CONTRACT

1.    Underlying Principles

The primary objective of contract interpretation is to ascertain the parties' mutual intent at the time they executed the contract. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). Washington follows the "objective manifestation theory" of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent. *Hearst*, 154 Wn.2d at 503. "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst*, 154 Wn.2d at 504.

To assist in determining the meaning of contract language, Washington courts also apply the "context rule." *Viking Bank*, 183 Wn. App. at 713 (citing *Berg v. Hudesman*, 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990)). This rule allows examination of the context surrounding a contract's execution, including the consideration of extrinsic evidence, to help understand the parties' intent. *Hearst*, 154 Wn.2d at 502. Extrinsic evidence is to be used only to determine or clarify the meaning of specific words and terms in the contract, and not to show an intent independent of the instrument or to vary the words used. *Hearst*, 154 Wn.2d at 503; *King v. Rice*,

5

146 Wn. App. 662, 671, 191 P.3d 946 (2008), *review denied*, 165 Wn.2d 1049 (2009). Admissible extrinsic evidence does not include evidence of a party's unilateral or subjective intent as to the contract's meaning. *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994). Courts do not interpret what was intended to be written but what was written. *Hearst*, 154 Wn.2d at 504.

    2.    Section 16.3

The parties agree that this case turns on the interpretation of the termination provisions in section 16.3 of the lease agreement and, in particular, the meaning of the word "likewise." This word follows the description of the tenant's termination rights and prefaces the description of the landlord's termination rights.

As stated, section 16.3 provides that a tenant may terminate the lease 12 months after the landlord fails to satisfy the co-tenancy requirement "and for so long as such non-satisfaction shall continue" upon giving the landlord 60 days' notice. CP at 234. Section 16.3 then states that the landlord shall "likewise" have a right to terminate the lease "at the end of the fourteenth (14th) month following the initial nonsatisfaction" of the co-tenancy requirement by giving the tenant 60 days' prior notice. CP at 234.

RPAI contends that it is reasonable to read the word "likewise" to convey the same termination rights to the landlord as to the tenant. RPAI argues that it therefore has an ongoing right to terminate the lease that takes effect on the last day of the 14th month following nonsatisfaction of the co-tenancy requirement, and that this right continues "for so long as" the nonsatisfaction lasts. RPAI asserts that if the parties had intended its termination rights to be waived if not exercised at the end of the 14th month, they would have so stated, as shown by

6

another lease provision stating that if the landlord ceases to claim reimbursement for certain expenses within a certain timeframe, its right to recover is "deemed to have been waived." CP at 26.

Michaels responds that "likewise" simply means that RPAI also has termination rights and that section 16.3 clearly shows the parties' intent to limit RPAI's right of termination to its exercise at the end of the 14th month following nonsatisfaction of the co-tenancy requirement. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY, at 1310 (1969) ("likewise" means "moreover" or "similarly"). Michaels contends that RPAI is attempting to rewrite the contract by (1) substituting "after" for "at" in the phrase allowing it to terminate "at the end of the 14th month" following nonsatisfaction of the co-tenancy requirement, (2) adding the "for so long as" modifier to RPAI's termination clause so that both Michaels and RPAI have the right to terminate as long as the nonsatisfaction continues, and (3) reading "likewise" as a single word that grants RPAI the same termination rights as Michaels despite the different language used. *See Markel Am. Ins. Co. v. Dagmar's Marina, LLC*, 139 Wn. App. 469, 480, 161 P.3d 1029 (2007) (when drafter of agreement employs different terms instead of parallel terminology, the presumption is that the change in usage was purposeful and reflects different meaning).

As support for its interpretation of section 16.3, Michaels cites a federal district court decision that examined a similar provision after another shopping center attempted to terminate its lease with a Michaels store. *Regency Realty Group, Inc. v. Michaels Stores, Inc.*, 2012 WL 954639

(E.D. Mich.) (court order).[2] In granting Michaels summary judgment on its declaratory relief claim, the district court held that the different language used to describe the parties' termination rights was determinative:

> Regency and Michaels are both sophisticated parties that have presumably negotiated and entered into numerous commercial leases. Presumably, both parties acted upon the advice of counsel in drafting, negotiating, and entering into the Lease. The fact that the parties used language granting a continuing option in Michael's [sic] termination provision and did not use that same language in Regency's option to terminate is convincing evidence that Regency does not have an ongoing option.

*Regency*, 2012 WL 954639, at *7. The district court then rejected the landlord's argument that the word "likewise" in section 16.3 gave the both the landlord and the tenant an ongoing right to terminate:

> The use of the word likewise indicates that Landlord also has the right to terminate; it does not indicate that Landlord's termination right is procedurally identical to Tenant's. After the term likewise, the contract describes the procedures by which Landlord may exercise its termination right. These procedures are materially different from those granted Tenant. Landlord essentially asks the Court to alter the plain language of the contract by changing "at the end of the twelfth month" to "after the end of the twelfth month." The Court, however[,] must honor the parties' bargain and respect the plain language of the contract as written.

*Regency*, 2012 WL 954639, at *7. The district court concluded that the lease unambiguously granted the landlord a one-time option to terminate the lease, that the landlord did not timely exercise that right, and that judgment on the termination issue should enter for Michaels as a matter of law. *Regency*, 2012 WL 954639, at *8.

---

[2] The Michigan lease provision was identical to the provision at issue except for the different time periods that triggered the parties' termination rights. *Regency*, 2012 WL 954639, at *2. We may cite this unpublished decision because the federal rules allow its citation. GR 14.1(b); Fed. R. App. P. 32.1.

RPAI complains that this interpretation considers the words used in section 16.3 totally divorced from any facts, circumstances, and extrinsic evidence. RPAI cites the commercial context of the lease in arguing that there is no indication that the parties intended to impose a major disparity in termination rights where the tenant's right to terminate would never end, but the landlord's right would last only one day. RPAI contends that its interpretation of section 16.3 is more reasonable than Michaels' because it gives each party the opportunity to adjust to market conditions as they exist in the commercial world. *See Byrne v. Ackerlund*, 108 Wn.2d 445, 453-54, 739 P.2d 1138 (1987) (where one construction would make a contract unreasonable, and another, equally consistent with its language, would make it reasonable, the latter construction must prevail). According to RPAI, Michaels' interpretation of section 16.3 is punitive and a "disconnect with commercial reality." Br. of Appellant at 10.

Michaels responds that it is commercially reasonable to give the tenant greater termination rights because satisfaction of the co-tenancy requirement was a major part of the parties' bargain and because it was RPAI's duty to satisfy that requirement. Michaels points out that if RPAI had a continuing right to terminate in the event of nonsatisfaction, it would have far less incentive to satisfy the co-tenancy requirement.

Both parties' references to extrinsic evidence focus on their own observations of what is commercially reasonable. Although the parties engaged in some discovery before the superior court considered Michaels' motion for summary judgment, there is no evidence in the record concerning the parties' lease negotiations. The only additional facts provided consist of RPAI's description of its difficulties in obtaining another anchor tenant and its assertion that Michaels' yearly sales increased after Gottschalks closed.

9

As stated, the context rule allows the use of extrinsic evidence only to determine the meaning of specific words used in the contract and not to vary or modify the language used. *See McCormick v. Dunn & Black, P.S.*, 140 Wn. App. 873, 891, 167 P.3d 610 (2007) (courts do not have the power, under the guise of interpretation, to rewrite contracts), *review denied*, 163 Wn.2d 1042 (2008). In *Hearst*, the court held that extrinsic evidence concerning the defendant's acts following adoption of the contract did not shed meaning on the words in the contract and was irrelevant to their interpretation. 154 Wn.2d at 510 n.14; *see also Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 697, 974 P.2d 836 (1999) ("[e]xtrinsic evidence is to be used to illuminate what was written"). Here, too, the difficulty of obtaining a new anchor tenant and Michaels' revenues following Gottschalks' departure are irrelevant to the meaning of the words used in section 16.3. Because the language of the contract is unambiguous and clearly shows that RPAI did not exercise its termination rights in a timely manner, we affirm the superior court's grant of summary judgment in favor of Michaels.

C.    ATTORNEY FEES

Michaels requests an award of attorney fees on appeal. A prevailing party may recover such fees if permitted by applicable law, which includes contractual fee provisions in commercial leases. RAP 18.1(a); *City of Puyallup v. Hogan*, 168 Wn. App. 406, 430, 277 P.3d 49 (2012). Section 14.5 of the lease provides that following an action between the landlord and the tenant relating to the lease, the prevailing party may recover reasonable attorney fees. We grant Michaels' request for reasonable attorney fees on appeal.

No. 46071-8-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Maxa, P.J.

_____
Melnick, J.

11