**FILED**
**SEPTEMBER 26, 2017**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CORNERSTONE EQUITIES, LLC, a Washington Limited Liability Company, | ) ) ) | No. 34828-8-III |
| Respondent/Cross Appellant, | ) ) | |
| v. | ) ) ) | |
| MAHLEN INVESTMENTS, INC. a Washington Corporation, CRAIG L. MAHLEN and KAREN L. MAHLEN, husband and wife and DOES 1-10, | ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants/Cross Respondents, | ) ) | |
| KEITH SCRIBNER and JANE DOE SCRIBNER, husband and wife, | ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, J. — A real estate tenant, Mahlen Investments, Inc. (Mahlen), and its

landlord, Cornerstone Equities, LLC (Cornerstone), appeal and cross appeal the outcome

of a bench trial. The trial court awarded Cornerstone damages for Mahlen's breach by

anticipatory repudiation of the parties' commercial lease, but in an amount less than requested. Mahlen argues that substantial evidence does not support a handful of the trial court's findings and its findings do not support its conclusion that Mahlen, rather than Cornerstone, breached the lease. Cornerstone argues that the court erred in measuring its damages by a discounted rental rate it agreed to accept temporarily, rather than the full rate provided by the original lease.

We find no error, affirm, and award Cornerstone its attorney fees and costs on appeal.

## FACTS AND PROCEDURAL BACKGROUND

The following facts are principally based on the trial court's unchallenged findings of fact (FF), which are verities on appeal. Findings challenged by Mahlen will be highlighted and discussed as appropriate.[1]

In spring 2013, Mahlen purchased the assets of a business that operated two dry-cleaning locations in Spokane—one that served only as a drop-off and pickup location, and one where the dry cleaning was performed. FF 16-17, 20-21. Mr. Mahlen, the corporation's owner, had no prior dry cleaning experience, but had owned a laundromat in the past, and at the time owned a 46,000 square foot business park in Indiana. FF 18-19.

---

[1] *See* Clerk's Papers (CP) at 859-82 (Am. Findings of Fact & Conclusions of Law – Following Bench Trial).

2

Mr. Mahlen quickly discovered that he had sufficient staff and resources to process additional clothing at a small incremental cost and he began searching for an additional drop-off and pickup location downtown. FF 22, 77, 80. He was particularly interested in leasing a space from which he could offer drive-through service because customers liked the convenience and a downtown competitor offered drive-through service at both of its locations. FF 26, 79.

After rejecting properties that did not have drive-through capacity, Mr. Mahlen settled on a commercial property owned by Cornerstone. FF 81, 8, 9. That property, located at 1101 North Division, had no existing drive-through capacity, but by July Mr. Mahlen and Keith Scribner, one of Cornerstone's partners, signed a nonbinding letter of intent that contemplated paving a drive-through lane and constructing a service window. FF 29-30.

On August 2, 2013, Mahlen and Cornerstone executed a retail center lease for the North Division property for a term of five years, effective September 1. FF 31, 34. Paragraph 3.1(a) of the lease provided that improvements to the premises would be constructed by Cornerstone "pursuant to and upon the timeframe set forth on [an attached] Exhibit 'C'," which stated:

**EXHIBIT "C"**
**(Landlord's Work)**

Landlord agrees to complete the following:

3

1) Install ADA restroom. Restroom to be completed with handicapped bars but does not include towel, toilet and soap dispensers
2) Sheet rock exterior walls inside space, tape mud and prime ready for paint
3) Provide electrical box every 12 feet in exterior walls
4) Install grid ceiling
5) Install Ceiling tile and lighting
6) Install back door approx. 3ft by 7ft in rear of space next to bathroom (South wall)
7) Add a 5ft by 5ft window in rear side of space approximately 10 feet from the rear west wall
8) Pave or asphalt around west side of building approximately 12 feet wide from the front of building to rear of building **(This item cannot be completed [by] possession date but will be completed within 90 days after the possession date)**
9) Provide washer dryer hookup in east wall next to restroom with hot and cold water, gas supply, 110 outlet for washer, 230 volt outlet for dryer, dryer vent, gas vent and gas line for dryer, and a gas or electric 40 gallon hot water heater.

Ex. P 1-9, P 1-44 (emphasis added); *see* FF 47.

Paragraph 5.3 of the lease provided that "[i]f for any reason whatsoever landlord has not delivered the Premises to Tenant with Landlord's Work substantially complete on or before December 1st, 2013," then, "as Tenant's sole and exclusive remedy, this Lease shall be deemed automatically cancelled, and shall have no force or effect . . . ." Ex. P 1-11; FF 39. Mahlen ultimately took possession of the premises on October 18, 2013, and Cornerstone completed eight of the nine items listed in exhibit C of the lease by the third week of October. FF 48, 87. Only item 8, the paving of the drive-through lane, remained uncompleted. FF 48. By the term of exhibit C highlighted above, the paving was not

4

required to be completed until January 16—90 days after the possession date and 7 weeks after the "automatic cancellation" date provided by paragraph 5.3. Ex. P 1-11; FF 47-48, 87.

Cornerstone took the position that its obligation to complete the paving was extended beyond January 16 by article 20 of the lease, after it learned from the city of Spokane that a city-owned alley adjacent to Cornerstone's property—two feet of which fell within the 12-foot lane Cornerstone had agreed to pave—had to be vacated before the paving could be done. Clerk's Papers (CP) at 6. Article 20 excuses a party's delayed performance in certain circumstances, including when the delay has a cause "beyond [the party's] reasonable control." Ex. P 1-25.[2] And on February 24, 2014, the parties executed a written amendment to the lease that recognized Cornerstone's lease obligation

---

[2] Article 20, captioned "Delaying Causes," provides:

> If either party is delayed in the performance of any covenant of this Lease because of any of the following causes (referred to elsewhere in this Lease as a "**delaying cause**"): acts of the other party, action of the elements, war, riot, labor disputes, inability to procure or general shortage of labor or material in the normal channels of trade, delay in transportation, delay in inspections, or any other cause beyond the reasonable control of the party so obligated, whether similar or dissimilar to the foregoing, financial inability excepted, then, such performance shall be excused for the period of the delay; and the period for such performance shall be extended for a period equivalent to the period of such delay, except that the foregoing shall in no way affect Tenant's obligation to pay rent or any other amount payable hereunder, or the length of the term of this Lease.

Ex. P 1-25 (second emphasis added).

to pave or asphalt around the west side of building but stated, "Due to unforeseen circumstances, Lessor, to date, has not yet received the necessary permits from the City of Spokane to complete this improvement." Ex. P 5-1; FF 66. The amendment continued:

> Therefore, Lessor has agreed to lower the total base rent to half of the base rent to $1092.50 . . . each month beginning March 1st 2014, until the proper permits are issued and this improvement is completed.

Ex. P 5-1. After providing that Cornerstone would increase its promised improvements to include a pylon sign as well, the amendment stated:

> The month this improvement and the pylon sign referred in second paragraph of this addendum are completed, rent shall be prorated for the month and Lessor will provide Lessee an accounting of that prorated month.

*Id.* The amendment finally provided that "except as herein modified, all terms and conditions of said Lease dated September 1st, 2013, shall be the same and remain in full force and effect." *Id.* Although Mr. Mahlen attempted to negotiate a completion date for the drive-through in the February amendment, none was included in the amendment as finalized and signed. FF 67.

Several months later, in June 2014, Mr. Mahlen called Mr. Scribner and said: "I have found out that that drive-thru will never get paved and I'm moving out." Report of Proceedings (RP) at 32; FF 68.

6

Mahlen did not pay rent for July. FF 70.[3] Rent was due the first day of each month pursuant to paragraph 6.1 of the lease, and article 27, section 1 of the lease provided that Mahlen's failure to pay rent when due would constitute a material breach and result in default. Ex. P 1-12, P 1-29; FF 35-36. On July 16, 2014, a Cornerstone agent e-mailed a written notice of default to Mr. Mahlen for the nonpayment of the rent due on July 1. FF 71.

On August 1, 2014, Mahlen, through counsel, gave formal notice that it would vacate the premises by August 31, 2014, which it did. FF 72-73, 94.

The trial court's conclusions of law (CL) entered following the bench trial contained a number of findings of fact. On appeal, we review findings of fact erroneously labeled as conclusions of law as the factual findings that they are. *E.g.*, *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). Among the findings of fact included in the trial court's conclusions were the following:

- That both Mr. Scribner and Mr. Mahlen are experienced in negotiating and executing commercial leases, *see* CL 2;

- That the lease amendment of February 24, 2014, was supported by mutual consideration in that Cornerstone received an extension of time for completion of the paving in exchange for Mahlen receiving a 50 percent reduction in rent until paving was completed and the installation of pylon signage at no cost to Mahlen, *see* CL 9;

---

[3] As discussed below, Mahlen disputes the trial court's finding that it failed to pay rent after June because it claims it had "sufficient funds on deposit" to cover rent July and August 2014. Br. of Appellant at 46.

7

▪ That the parties to the lease amendment had equal opportunity to negotiate the contractual terms, *see* CL 10;

▪ That before Mr. Mahlen's June 2014 phone call notifying Mr. Scribner of his intent to vacate the premises at the end of August 2014, Mr. Mahlen had not expressed frustration with the delays in constructing the drive-through nor provided written notice of the alleged default as required under article 37 of the lease, and Mr. Scribner was unaware of Mr. Mahlen's frustrations, *see* CL 21-22; and

▪ That considering the nature of the contract, the position of the parties, their intent, and the circumstances surrounding performance, Cornerstone was in the process of performing its obligation to complete the drive-through in good faith and in a reasonable time through the time Mahlen gave notice of its intent to vacate the premises. *See* CL 17-18.

On December 1, 2014, Cornerstone filed suit for damages for breach of the lease and to enforce a personal guarantee. In an answer and third party complaint against Mr. Scribner and his wife, Mahlen contended it had been fraudulently induced to enter into the lease and refrained from terminating it by Cornerstone's assurances that the drive-through could be built and was being diligently pursued. It also contended that its performance was excused by Cornerstone's failure to complete the paving within 90 days of possession, as a result of which it claimed it had a continuing right under paragraph 5.3 to terminate the lease.

Cornerstone contended that even if its progress on the drive-through had arguably been insufficient, the parties' lease afforded Cornerstone the opportunity to cure in the event it defaulted, and a written notice of default was required. Article 37 of the lease provides:

8

> In the case of a default by Landlord, Landlord shall commence promptly to cure such default immediately after receipt of written notice from Tenant specifying the nature of such default and shall complete such cure within thirty (30) days thereafter, provided that if the nature of such default is such that it cannot be cured within said thirty (30) day period, Landlord shall have such additional time as may be reasonably necessary to complete its performance, so long as Landlord has proceeded with diligence after receipt of Tenant's notice and is then proceeding with diligence to cure such default.

Ex. P 1-29; FF 43. Article 22 of the lease mandates that all notices, requests, and demands be in writing. FF 41.

Following a bench trial, the trial court found that Mahlen was the breaching party and entered judgment in favor of Cornerstone, awarding damages measured by the full monthly rental provided by the original lease. Mahlen moved for reconsideration that was granted in part; the trial court reduced the damage award by half, relying on the reduced rental amount provided by the February 2014 amendment.

Mahlen appeals and Cornerstone cross appeals.

## ANALYSIS

### APPEAL

Following a bench trial and the trial court's weighing of the evidence, our review is limited to ascertaining whether the findings of fact are supported by substantial evidence and, if so, whether the findings support the conclusions of law and the judgment. *City of Tacoma v. State*, 117 Wn.2d 348, 361, 816 P.2d 7 (1991). The appellant's brief must include a separate assignment of error for each finding of fact a

9

party contends was improperly made. RAP 10.3(g). Unchallenged findings are verities on appeal. *Moreman v. Butcher*, 126 Wn.2d 36, 39, 891 P.2d 725 (1995). Of the trial court's 97 findings, Mahlen assigns error to only 5: findings 58, 59, 60, 70, and 97. Its overarching objection to the trial court's conclusions are to its conclusion that Cornerstone did not breach a duty to complete the drive-through within the reasonable time a court will imply when a contract—here the lease amendment—is silent as to time for performance. It also contends that the trial court erred by finding that Mr. Scribner and Cornerstone did not negligently or intentionally misrepresent an intention to complete construction of the promised drive-through.

*Sufficiency of evidence and conclusions in support of the trial court's findings on breach*

Mahlen challenges finding 58 on the basis that architectural designs the court found were obtained by Mr. Scribner from Martin J. Hill Architecture between February and April 2014 were in fact obtained by Mr. Scribner earlier, according to the architect's invoice indicating his work was limited to the period between April 2013 and January 20, 2014. Br. of Appellant at 31. Mahlen concedes the trial court's finding that structural calculations were obtained by Mr. Scribner in the February-April 2014 time frame, but argues they were sign-related, not drive-through related, and were an inconsequential amount of the work that needed to be done. *Id.* at 32.

10

Finding 59, that "[s]ometime between November 2013, and January 2014, Mr. Scribner learned that Cornerstone owned only 10 feet between the building and west property line, not the 12 feet required for the drive-thru," is challenged. The finding is supported by Mr. Scribner's testimony that he learned that Cornerstone owned 10 rather than 12 feet after the city stopped excavation by Cornerstone's contractor on November 4, 2013. Mr. Scribner explained that he had thought Cornerstone owned 12 feet because it had demolished what he thought was a 12-foot building that extended west to the alley from the western wall of the existing building.

Mahlen's only citation to the record in support of its challenge to the trial court's finding that Mr. Scribner was unaware of the true distance to the property line is to exhibit P 82, a site plan for a remodel of the North Division property by Martin Hill produced in 2012. Br. of Appellant at 39. The exhibit itself tells us nothing about when or how carefully the plan was reviewed by Mr. Scribner. Mahlen does not cite any admission by Mr. Scribner that the site plan put him on notice of the true distance to the relevant property line. A cropped portion of exhibit P 82 is reproduced below and is distorted horizontally to remain legible but to better fit the page. The lower left corner of the plan is where the drive-through would be, and as can be seen, it does not clearly reveal that there is only 10 feet between the building and the property line:

11



Finding 59 is thus supported by substantial evidence.

Finding 60 is challenged for its statement that vacation of the city's alley adjoining

Cornerstone's property "would require approval from the landowners abutting the alley

and from the Spokane City Council," based on Mahlen's contention that it would only

require approval from one other owner, who, together with Cornerstone, owned a majority of the land abutting the alley. Br. of Appellant at 33-34.

Mr. Scribner testified inconsistently on this issue. He twice stated the city told him he would need approval from *all* of the neighboring property owners. He also stated that when evidence was presented at trial that only majority ownership of the abutting property was required, he was "really surprised," because it was the first time he had heard that information. RP at 368. But in exhibit D-102, a time line Mr. Scribner prepared and that Mahlen cites in challenging finding 60, Mr. Scribner wrote, with reference to January 2014:

> [Mr. Johnson] told me I had to get a list of all the property owners and have all them involved in the vacation process as the majority would need to improve this and the entire alley would need to be vacated.

Ex. D-102, at 6. When cross-examined about this statement, Mr. Scribner testified:

> A Okay. *A list of the property owners and have them all involved in a vacation process as majority would need to approve this and the entire alley would need to be vacated.*
> Q The majority, right?
> A Correct.
> Q And the majority is what Eric Johnson testified to yesterday?
> A That's not what he told me.
> . . . .
> Q And then you wrote in your timeline that you knew as of January 2014 that it would be a majority; isn't that correct?
> A That is correct.

RP at 369-70 (emphasis added). While Mr. Scribner's testimony is somewhat confusing, given the ambiguity of the time line entry, undisputed evidence that Mr. Scribner suffers

13

from memory issues, and his actions in requesting a title map and trying to contact multiple neighboring property owners, the trial court could reasonably find that he believed in 2014 that unanimous consent was required. It is also possible that Mr. Scribner understood "majority" to mean the numerical majority of the abutting landowners rather than only those who owned a majority of the abutting property, however few that might be. Either way, finding 60 is supported by substantial evidence.

Mahlen challenges finding 70's statement that it only paid rent through June 2014 on the basis that it paid a deposit at the outset of the lease that was sufficient, if applied, to cover July and August rent. Br. of Appellant at 46. But under paragraph 5.4 of the lease, the deposit on which Mahlen relies was applicable to its defaults in Cornerstone's "sole discretion." Ex. P 1-11. If Cornerstone chose not to apply the deposit to defaults, it was not required to return it to Mahlen until a reasonable time after expiration of the lease, which would be, at the earliest, five years after the beginning lease date. Finding 70 is supported by substantial evidence.

Finally, Mahlen does not contest the accuracy of the trial court's finding 97, which states in relevant part that in conjunction with efforts to vacate the alley after the February 2014 amendment, Cornerstone "contacted various neighbors seeking to inquire as to their thoughts on the vacation." CP at 871. Mahlen merely argues that these contacts were not evidence of "progress" toward vacating the alley since a majority of the land abutting the alley was owned by Cornerstone and a single other neighbor.

14

Even if we ignore all of the findings that are challenged by Mahlen, the trial court's remaining findings support its conclusions of law, which in turn support its judgment in Cornerstone's favor. Substantial evidence supports the court's finding that the February 24, 2014 lease amendment modified the requirement of the original lease that the paving or asphalting around the west side of the building be completed by 90 days after possession. This is clear from the amendment's plain language that "[d]ue to unforeseen circumstances, Lessor, to date, has not yet received the necessary permits from the City of Spokane to complete this improvement. Therefore, Lessor has agreed to lower the total base rent to half of the base rent . . . until the proper permits are issued and this improvement is completed." Ex. P 5-1. It is frivolous to argue, as Mahlen does, that the concluding statement, "[E]xcept as herein modified, all terms and conditions of [the original] Lease . . . remain in full force and effect," preserved Mahlen's right to terminate the lease under paragraph 5.3 for failure to meet the original deadline.

Applying Washington law, the court correctly concluded that with the elimination of a date for completion of the drive-through improvement, it was to impose a reasonable time determined by the nature of the contract, the positions of the parties, their intent, and the circumstances surrounding performance. *See Pepper & Tanner, Inc. v. KEDO, Inc.,* 13 Wn. App. 433, 435, 535 P.2d 857 (1975). "What may be considered a reasonable time is usually a mixed question of law and fact. Normally, a determination of what

15

constitutes a reasonable time is a question for the trier of fact." *Jarstad v. Tacoma Outdoor Recreation, Inc.*, 10 Wn. App. 551, 558, 519 P.2d 278 (1974) (citation omitted).

We need not review the trial court's numerous findings addressing the reasonableness of the time taken by Cornerstone because Mahlen's failure to provide notice and an opportunity to cure is an independently sufficient basis on which to uphold the trial court's conclusion that only Mahlen breached the lease.[4]

The trial court's findings support its conclusion that Mahlen never provided written notice to Cornerstone that it had (allegedly) defaulted by failing to complete the paving or asphalting within a reasonable time. Written notice followed by a period of 30 days to cure (or longer if, despite diligence, additional time is necessary) is required by article 37. Ex. P 1-35. Article 22 reinforces that all notices must be in writing. Mahlen argues that it substantially complied by waiting over 30 days after its June telephone call to move out. But its notice in June was not written. *See Mike M. Johnson, Inc. v. County of Spokane*, 150 Wn.2d 375, 388, 78 P.3d 161 (2003) (affirming the well established

---

[4] Mahlen makes much of finding 95, that "[t]he Court does not find that [Cornerstone] substantially performed the work that was required of it by the parties' Lease and their February 2014 amendment." That finding was added after Mahlen moved for reconsideration and argued that the February 2014 reduction of rent by half demonstrated that the construction of the drive-through was a material part of the promised improvements. The court agreed. Finding 95 is inconsequential, since it is undisputed that Cornerstone abandoned construction of the drive-through. It was permitted to, as a result of Mahlen's breaches by anticipatory repudiation and nonpayment of rent.

principle that procedural contract requirements such as written notice must be enforced absent waiver or modification). Nor would the June communication reasonably be understood by Cornerstone as affording it the right and opportunity to cure the default.

Similarly, the August 1, 2014 letter stating that Mahlen would vacate on August 31 provided 30 days' notice and this time was written, but it did not state that it was a notice of default under the lease nor did it acknowledge any right of Cornerstone to cure. Also, by the time of the August letter, Mahlen had done more than breach by anticipatory repudiation—it had defaulted in payment of rent. (A default of which it was given notice and never cured.).

The trial court's findings support its conclusion that Cornerstone was deprived of the opportunity to cure the asserted default within 30 days. They support its conclusion that even if Mahlen did not breach by anticipatory repudiation by announcing an intention to vacate at the end of August, it breached the lease by ceasing to pay rent and vacating the premises without ever having adhered to the requirements of article 37.

### *Misrepresentation*

Mahlen argues the trial court erred when it found no negligent or intentional misrepresentation by Cornerstone—misrepresentation it asserted both as an affirmative defense to breach of contract and as tort counterclaims.

The tort of negligent misrepresentation requires proof that (1) a defendant supplied information for the guidance of others in their business transactions that was false, (2) the

17

defendant knew or should have known that the information was supplied to guide the plaintiff in business transactions, (3) the defendant was negligent in obtaining or communicating false information, (4) the plaintiff relied on the false information supplied by the defendant, (5) the plaintiff's reliance on the false information supplied by the defendant was justified, and (6) the false information was the proximate cause of damages to the plaintiff. *Lawyers Title Ins. Corp. v. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002). Intentional misrepresentation—fraud—requires proof of (1) a representation of an existing fact, (2) materiality, (3) falsity, (4) the speaker's knowledge of the representation's falsity, (5) intent of the speaker that it should be acted on by the plaintiff, (6) plaintiff's ignorance of its falsity, (7) plaintiff's reliance on the truth of the representation, (8) plaintiff's right to rely on the representation, and (9) damages suffered by the plaintiff. *W. Coast, Inc. v. Snohomish County*, 112 Wn. App. 200, 206, 48 P.3d 997 (2002). Both torts must be proved by clear, cogent, and convincing evidence. *Baik*, 147 Wn.2d at 545 (negligent misrepresentation); *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 166, 273 P.3d 965 (2012) (fraud).

Mahlen argues that Cornerstone was negligent in determining whether or not it could construct the drive-through and the process by which that would happen; falsely representing first, that the drive-through could be completed by August 31, 2013, and later, that it could be completed within 90 days of Mahlen's possession. Br. of Appellant at 38. The trial court did not make express findings of any of the facts material to

18

Mahlen's tort claims, so those facts are deemed to have been found against Mahlen. *State v. Souza*, 60 Wn. App. 534, 541, 805 P.2d 237 (1991) (citing *Crites v. Koch*, 49 Wn. App. 171, 176, 741 P.2d 1005 (1987) for the "long-standing rule in civil cases"). And the trial court's conclusion of law 39 contains findings of fact in support of its determination that Mahlen failed to prove the elements of its negligent misrepresentation and fraud claims.

Mr. Scribner testified at trial that before entering into the lease with Mahlen, he had never received any information from any source that caused him to believe a drive-through of the sort he and Mr. Mahlen had discussed could not be incorporated into the property. He testified that even before signing the lease with Mahlen, he had begun to take steps toward getting the drive-through constructed. The trial court made the following subsidiary findings of fact in support of its finding (labeled as a conclusion) that Mr. Scribner never provided false information but merely underestimated the work required to complete the drive-through:

> Mr. Scribner never provided false information to the Defendants. . . .
> Once the degree of work was realized, Mr. Mahlen acquiesced to the delay
> by negotiating and executing the Amendment without the addition of
> completion date. More compellingly, not only did Mr. Scribner complete
> eight of the nine obligations contained in "Exhibit C" to the Lease, in
> attempting to complete the drive-thru, and prior to Mr. Mahlen's
> anticipatory breach, Mr. Scribner enlisted contractor Gerald Kofmehl to
> provide a bid regarding a drive-thru, received a bid from Arrow Concrete &
> Asphalt concerning the construction of the drive-thru, realized the need for
> a retaining wall on Boone Court, LLC's, property line, received a bid from
> All Star Excavation to excavate drive-thru, authorized All Star Excavation

19

> to begin work on the drive through area, enlisted Metro Engineering to create a grading plan, submitted the grading plan to the City, obtained architectural designs from Martin J. Hill Architecture, Inc., obtained structural calculations from Inland Northwest Engineering, Inc., received information from Stewart Title of Spokane on who all of the property owners were with land abutting the alley, contacted all of the property owners to seek approval for the vacation, and obtained an application to vacate the alley from the City.

CP at 879.

The representations about which Mahlen complains concerned future events. As such, they did not concern "presently existing fact[s]"—an explicit element of a fraud claim and also a prerequisite for a negligent misrepresentation claim:

> Although promises of future conduct may support a contract claim (or similar claim such as promissory estoppel in an appropriate case), failure to perform them cannot alone establish the requisite negligence for negligent misrepresentation. This is because of the absence of any false representation as to a presently existing fact, a prerequisite to a misrepresentation claim.

*Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 182, 876 P.2d 435 (1994) (citation omitted).

Mahlen also contends Cornerstone committed negligent misrepresentation when it stated that the delay in the project was the result of waiting on the city to issue permits. The portion of the record it cites for support is testimony that Cornerstone made this representation in June 2014, after both the lease and amendment had been executed. *See* RP at 131. There is no evidence Mahlen relied on that information to its detriment. Far from relying on the statement, Mr. Mahlen undertook his own investigation in June, and

20

on learning that only one permit was pending at the city, notified Mr. Scribner that Mahlen would vacate in August.

Mahlen further contends Mr. Scribner could not have intended to construct the 12-foot drive-through because he knew Cornerstone only owned 10 feet of the width of property needed. We rejected that argument in finding sufficient evidence to support finding 59.

## *Damage issues*

Mahlen's brief raises two damage issues, one of which was never raised in the trial court until Mahlen moved for reconsideration.

Mahlen argues that even if Cornerstone is entitled to damages, the trial court erred by awarding Cornerstone rent for July and August 2014, in light of the deposit Mahlen was required to make under the lease. As previously discussed, the deposit was available to be applied to defaults at Cornerstone's discretion, with the balance, if any, to be returned to Mahlen within a reasonable time following expiration of the lease term. Any part of the deposit that was not taken into consideration in the court's October 2016 judgment[5] therefore needs to be taken into consideration before a final disposition of the parties' rights and interests. Mahlen does not show that it will not be. Cornerstone points out that it did not elect to accelerate rent, the premises have not been relet, the lease term

---

[5] *See* CP at 885 (J. After Trial) (crediting Mahlen with $2,643 for "deposit").

21

has not expired, and future litigation is contemplated. Second Am. Br. of Resp't at 38. That argument is a sufficient explanation. Mahlen offers no argument in reply.

Mahlen also raises a challenge to common area maintenance charges. For the first time in a motion for reconsideration, it argued (1) that the tenants, not Cornerstone, did all of the maintenance work, and (2) under *Viking Bank v. Firgrove Commons 3, LLC,* 183 Wn. App. 706, 334 P.3d 116 (2014), Cornerstone cannot recover management fees that it unilaterally incurred for its own benefit.

*Viking Bank* turned on construction of language of the parties' lease in that case. If Mahlen contends that Cornerstone's damage claim included common area maintenance charges or management fees that Mahlen never agreed to pay, it needed to rely on its own lease, not a 2014 construction of Viking Bank's lease. It also needed to present evidence during the trial of the amount and nature of the fees and argument of why they were not owed.

The trial court denied Mahlen's motion for reconsideration on this point. We find no error or abuse of discretion in that denial.

## CROSS APPEAL

Cornerstone cross appeals the trial court's decision that reduced its award of unpaid rent damages to 50 percent as provided by the February amendment, arguing that the trial court originally found, correctly, that once Mahlen breached by anticipatory repudiation, Cornerstone was excused from its obligation to construct the drive-through

22

and was therefore entitled to the full monthly rent amount called for by the original lease. Br. of Resp't & Cross Appellant at 41-42.[6]

We agree that the trial court correctly found that Mahlen's breach by anticipatory repudiation excused Cornerstone from further efforts to complete the drive-through. But we disagree that it revived the original amount of the rent. The effect on the rent is governed by the terms of the parties' lease, as amended. And the lease amendment provides, in relevant part:

> Lessor has agreed to lower the total base rent to half of the base rent to $1092.50 ($2185 divided by 2 equals $1092.50) each month beginning March 1st 2014, **until the proper permits are issued and this improvement is completed**. This shall include the pylon sign as well. The month this improvement and the pylon sign referred in second paragraph of this addendum are completed, rent shall be prorated for the month and Lessor will provide Lessee an accounting of that prorated month. Common area expense charges each month shall remain the same per the lease agreement.

Ex. P 5-1 (emphasis added).

The present contingency might not have been contemplated by the parties. But we will not rewrite their agreement and impose an outcome different from that literally

---

[6] Mahlen argues that RAP 2.5(b) precludes Cornerstone from appealing this issue because it accepted the benefits of the trial court's decision without posting security. The rule provides in relevant part that a party may accept the benefits of a trial court decision without losing the right to obtain review "if, regardless of the result of the review based solely on the issues raised by the party accepting benefits, the party will be entitled to at least the benefits of the trial court decision." RAP 2.5(b)(iii). That is the case with Cornerstone and the issues it raises. It has not lost the right to appeal the allegedly insufficient award of damages.

23

provided by their agreement. *See Wagner v. Wagner*, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980) (In construing a contract, a court must interpret it according to the intent of the parties as manifested by the words used; we neither disregard contract language . . . nor revise the contract under a theory of construing it.). The event that triggers a renewed obligation to pay the full amount of rent has not occurred.

## ATTORNEY FEES

Both parties request attorney fees and costs on appeal under RAP 18.1 and their lease, which provides for an award of reasonable attorney fees and costs to the prevailing party. As the prevailing party, Cornerstone is awarded reasonable fees and costs on appeal subject to its compliance with RAP 18.1(d).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Pennell, J.

24