# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| TIM  HELGREN, and  SHERRY  HELGREN, husband and wife, | No.  60078-1-II |
| Appellant, | |
| v. | |
| LANCE BROWN, an unmarried individual, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, J. — Timothy and Sherry Helgren[1] appeal a trial court order denying their claim for adverse possession of a beach area and parking strip[2] on Lance Brown's property.  The Helgrens argue that the trial court erred by concluding that the Helgrens did not adversely possess the beach area and parking strip.  The Helgrens also request appellate attorney fees.

We  hold  that  the  Helgrens  adversely  possessed  the  beach  area  and  parking  strip. Accordingly, we reverse the trial court's order as it relates to the beach area and parking strip, and remand for the trial court to quiet title to the beach area and parking strip in the Helgrens' favor. We award the Helgrens their attorney fees on appeal.

---

[1]  We refer to the Helgrens individually by their first names and collectively as the Helgrens.  No disrespect is intended.

[2]  The parking strip is also referred to as a flower bed or planting area in the trial court.

FACTS

A.    BACKGROUND

The Helgrens bought their property in Olympia in 2007. The neighboring property, owned by Paul Sanders, was an upside-down L shaped lot that bordered the Helgrens' property to the north and east. Sanders had owned his property since 1983. Both properties were on the shore of Lake St. Clair.

A chain link fence, or cyclone fence, that surrounded much of the Helgrens' property had been in place since the early 1990s. On the north side of the Helgrens' property, the fence ended at the edge of the Helgrens' deck, which was some distance back from the waterline. Beyond the deck, there was a path down to the waterline.

On the outside of the Helgrens' fence on both the north and east sides was a band of trees that the Helgrens and Sanders treated as the property line. The line of trees on the northern border extended down to the waterline. In agreement with the Helgrens, Sanders cut down some of the trees on the northern border between 2016 and 2018. A dead Douglas fir tree remained at the waterline. The Helgrens considered the dead fir tree to be the northwestern boundary marker for their property.

Along the southern border of the Helgrens' property, the cyclone fence formed a T, with one section running north as well as another section extending east, up to the trees on the edge of Sanders' driveway. The Helgrens believed that their property included an area to the south of the cyclone fence, between the fence and the road, all the way to the edge of Sanders' driveway. The Helgrens believed that a post at the edge of Sanders' driveway marked the southeast corner of their property.

Brown acquired Sanders' property in 2021. Brown then commissioned a survey to determine his property lines. The survey revealed that, among other things, the Helgrens' cyclone fence, drain field, and part of their deck encroached onto Brown's property. The dead fir tree was also several feet inside of Brown's property line.



Clerk's Papers (CP) at 110.

After receiving the survey, Brown asked the Helgrens for permission to remove part of the Helgrens' cyclone fence on the Helgrens' northern border to clear the stumps next to the fence. Brown promised to rebuild the fence when he was done. Instead of rebuilding the fence, Brown constructed a driveway along the property line and did not replace the fence.

B.    LAWSUIT

The Helgrens sued Brown, claiming adverse possession of the area inside their cyclone fence, as well as the path down to the water on the northern border of their property.[3] The Helgrens also sought a prescriptive easement for their drain field and an injunction to bar Brown from damaging the adversely possessed property.

In his answer to the Helgrens' complaint, Brown stated that the "[t]ree line was thought to be the boundary" between properties. CP at 19. Because there were no prior surveys, Brown stated that "[n]o one knew where the [b]oundary was" before his survey. CP at 19.

1.    Motion for Summary Judgment

The Helgrens moved for summary judgment, arguing that there was no genuine issue of material fact that they had adversely possessed the area that was inside their northern fence before Brown removed it, as well as the path to the beach beyond the Helgrens' deck. The Helgrens also argued that there was no genuine issue of material fact that they had adversely possessed the area inside their eastern fence and the tree line beyond that fence.

The trial court partially granted summary judgment. The trial court explained the extent of its ruling:

> 1.    There is no genuine issue of material fact that Plaintiffs have adversely possessed all areas of Defendant's property within the Plaintiffs' side of the existing and prior chain-linked fence lines, as documented by the 4-foot-tall cyclone fence encroachment shown on the survey commissioned by Defendant ("Prigge Survey").
>
> 2.    This Court is not granting summary judgment as to any areas not on Plaintiffs' side of the now-removed fence line on the northern border of Plaintiffs'

---

[3] The Helgrens initially filed suit in Pierce County and then stipulated to changing venue to Thurston County.

property. This includes areas west of the terminus of the northern fence line as is shown on the Prigge Survey.

. . . .

5. This Court is also not granting summary judgment as to the area south of the short portion of fence line that runs parallel to Sitkum Drive as is shown on the Prigge Survey.

6. Plaintiffs' claims for additional areas not within the prior or existing fence lines are reserved for further motion or trial on those issues as to the continuous, exclusive, hostile, open and notorious nature of Plaintiffs' use.

CP at 119 (citation omitted).

2. Bench Trial

At a bench trial, the Helgrens argued that they had adversely possessed the land inside of a line from the northeast corner of their property to the waterline on the north side of their property, and from the northeast corner down to a post near the road on the east side.

a. Testimony at trial

Between the cyclone fence and the road on the south side of the Helgrens property was a strip of grass. Past the T where the fence turned north, there was a bare patch of ground. At trial, the parties referred to this area as the "planting area," "flower bed," or "parking strip." Verbatim Rep. of Proc. (VRP) at 44, 45, 47. Sherry testified that the Helgrens planted flowers in the area beginning in 2007. Sherry also testified that no one but the Helgrens maintained that area before Brown moved in, and that the Helgrens never asked permission from anyone to maintain the area. The Helgrens offered photos from 2021 and later of landscaping they had done on the grass strip on their property and the area on Brown's property.

Sherry testified that the area south of the dead fir tree on the lakeshore was "our beach, our swim area." VRP at 63. Sherry stated that the Helgrens had maintained the beach, including the area on the south side of the dead fire tree, throughout their ownership. In contrast, Sanders had rented his property to people who did not maintain the property, and the renters did not use the beach near the tree because they had their own dock at a different location. Sherry also testified that until Brown moved in, the Helgrens and their family were the only ones who used the beach area south of the dead tree. And Sherry said that no one had challenged the Helgrens' use of that area before Brown.

Sherry testified that before the trees on the north side of the Helgrens' property were cut down, the Helgrens and Sanders treated the trees as the boundary between their properties. A photo from 2018 showed the line of stumps terminating in the dead tree at the waterline. The tree stumps were not in a completely straight line, but meandered slightly southwards. When discussing an exhibit showing a string tied from the northeast corner of the Helgrens' property to the dead tree, Sherry explained that at least one tree, a cedar, was south of the string line.

Timothy stated that the Helgrens treated a line from the northeast corner of their property to the dead fir as the boundary line since they moved in in 2007. Timothy said that Brown had asked for permission to remove a maple tree stump from a tree that belonged to the Helgrens and was located inside the Helgrens' side of this line.

The Helgrens submitted aerial photos that depicted both the tree line and the parking strip area by the road. Timothy explained how, between the end of the Helgrens' northern fence and the water, the trees formed the boundary line between properties:

> That whole area was lined with trees all the way down to the water. So we used that as the boundary, the treeline as the boundary running along the fence line where the fence wasn't there any more. So we just treated it like ours. . . . [T]he trees were like a wall. They were like a divider. So that whole area down there in the deck area was just separated from Sanders' property. There was a cedar down there and there were fir trees too.

VRP at 128-29. Photos from before the trees were cut down showed the tops of the trees proceeding down to the waterline. But there were no photos showing the base of the trees before they were cut down, only image of the stumps.

Timothy testified that Brown's property was a "jungle" before Brown bought it. VRP at 102. When the tree line stood on the Helgrens' northern border, Timothy would spray the Helgrens' side of the trees to keep back encroaching ivy and blackberry vines. The Helgrens submitted photos from recent years showing that the Helgrens raked the beach and weeded around the south side of the dead fir tree, while the north side was not maintained and was overgrown. The Helgrens also submitted an undated photo of their family playing at the lakeside.

Timothy referred to the parking strip area next to Brown's driveway as a "[f]lower bed." VRP at 107 (discussing Ex. 37). Timothy testified that, from when the Helgrens moved in until about 2021 there had been grass growing in the entire area south of the cyclone fence along the road, which the Helgrens regularly mowed. Timothy stated that the Helgrens had removed some of the grass near Brown's driveway and planted other vegetation in that area "[l]ast spring," which would have been 2022. VRP at 129. Photos from 2010 and 2012 showed that the Helgrens had mowed the grass that was within their property line during that time. But the Helgrens did not have any ground-level pictures from before 2021 to show that they had maintained the parking strip area next to Brown's driveway. In many aerial photos, tree foliage blocked the view of that

area, although a photo from 2019 appeared to show maintained grass in the area. In an aerial photo from 2018, the disputed area appeared bare and scrubby compared to the established grass on the Helgrens' property.

When Brown testified, he admitted that he had no personal knowledge of the contested areas from before 2020. Brown testified that he visited a different house on the lake beginning in 2004, and when he would observe Sanders' property from the water, he considered it a "junk property" and "wondered why somebody didn't take care of" it. VRP at 153. Brown agreed that when he bought his property, Sanders told him that the treeline demarcated the Helgrens' property line.

     b.  Trial court ruling

The trial court found that the relevant time period for determining adverse possession was from April 2007, when the Helgrens bought their property, to April 2017. The trial court did not make any credibility determinations.

The trial court concluded that the Helgrens had demonstrated adverse possession of the area inside their fence on the north side of their property, and to the base of the trees on the east side, including their drain field. The trial court made several findings about the beach area:

> 10. The string lines in Exhibit 17 and 18 were placed very recently. That string line does not show that it was ever understood or shown notoriously and openly to be a property line. However, the string line is helpful to the court because the court believes that it shows in places where the property line should be in places between the former tree line and the former fence line as discussed herein.

> 11. The trees that used to be between the properties of the Helgrens and Mr. Brown were removed in 2016, and that was done by Mr. Brown's predecessor in ownership. Based upon all of the exhibits and the testimony the court finds

that those trees that were previously there were Mr. Sanders' trees and therefore on Mr. Brown's property.

12. The parties agree that Mr. Brown asked to remove at least portions of the fence in order to remove stumps. Again, this indicates to the court that the trees that the stumps used to be associated with were Mr. Brown's property.

13. As to the North side of the property, the line starts at what has been labeled as "Point B" being the northeast corner of the Helgren property to which Mr. Brown made no claim of ownership. The Plaintiffs have proven by a preponderance of the evidence that they have adversely possessed the triangle from Point B to the end of their deck and the end of the cyclone fencing as it went back to the surveyed original boundary line as shown in the conclusions of law below.

14. The court declines to extend the Plaintiffs' adverse possessed area to the middle of the dead Douglas Fir given the stumps of the removed trees, as in Exhibit 6, as the stumps angle towards the Helgren property and do not follow a straight line from the corner of the cyclone fence at the end of the deck to the middle of the dead Douglas Fir tree. Beyond such line towards the water after the deck and cyclone fence, there were no improvements by the Helgrens. The line of adverse possession on the north of the Helgren property ends at the end of deck as the cyclone fence . . . turns back to the original property line as shown below in the conclusions of law.

CP at 216-17. The trial court also addressed the parking strip:

19. As to the area between Sitkum Drive and the cyclone fence running easterly up the hill from the Helgren Property to the Brown driveway, the pictures admitted in evidence do not show that such area was consistently maintained the same way. The parking strip differs drastically from prior pictures that the court has reviewed. The court finds that the tall ending fencepost doesn't indicate that it excludes anyone or shows anyone that it marks a property line.

CP at 218. The judgment included a map with the adversely possessed area shaded in:

9



CP at 225.

The adversely possessed area did not include the beach area along the north side of the Helgrens' property between the end of the Helgrens' fence and the water, and the strip at the southeast corner between the bottom of the fence and the road (i.e., the parking strip). The areas at issue in this appeal are marked in red below.



CP at 110 (red markings and associated text labels added).

The Helgrens appeal.

ANALYSIS

The Helgrens argue that the trial court erred by concluding that the Helgrens did not adversely possess the beach area or parking strip. The Helgrens assert that they provided evidence demonstrating that they satisfied each element of adverse possession for each area. Accordingly, the Helgrens ask this court to reverse and remand to quiet title to each area in their favor. Brown did not file a response brief.

11

A.    LEGAL PRINCIPLES

"We review a trial court's decision following a bench trial by asking whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). "'Substantial evidence' is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true." *Id*. (quoting *Sunnyside Valley Irr. Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)). We review both the trial court's application of facts to law and its legal conclusions de novo. *Happy Bunch, LLC v. Grandview N., LLC*, 142 Wn. App. 81, 88, 173 P.3d 959 (2007), *review denied*, 164 Wn.2d 1009 (2008).

"The doctrine of adverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is '(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.'" *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012) (quoting *ITT Rayonier, Inc. v. Bell,* 112 Wn.2d 754, 757, 774 P.2d 6 (1989)). "Title vests automatically in the adverse possessor if all the elements are fulfilled throughout the statutory period" of ten years. *Id.* at 72. "The 10-year statute of limitations does not require the owner by adverse possession to have held the property in an adverse manner continuously up to the time [they] seek[] to quiet title by lawsuit." *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 51, 271 P.3d 973, *review denied*, 174 Wn.2d 1018 (2012); *see also El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 855, 376 P.2d 528 (1962). Instead, the claimant may "bring [their] action any time after" they have "held possession adversely for ten years." *Nickell*, 167 Wn. App. at 51; *see El Cerrito*, 60 Wn.2d at 855 (discussing a case affirming an

adverse possession ruling in an action brought 20 years after the adverse possession elements were last met).

"'A claimant can satisfy the open and notorious element by showing either (1) that the title owner had actual notice of the adverse use throughout the statutory period or (2) that the claimant used the land such that any reasonable person would have thought he owned it.'" *Nickell*, 167 Wn. App. at 50 (quoting *Riley v. Andres,* 107 Wn. App. 391, 396, 27 P.3d 618 (2001)). Similarly, "[a]ctual possession is established only if possession is of such a character as a true owner would make considering the nature and location of the land in question." *LeBleu v. Aalgaard*, 193 Wn. App. 66, 81, 371 P.3d 76 (2016). For exclusivity, a claimant's possession need not be *absolutely* exclusive in order to satisfy the element. *Lilly v. Lynch*, 88 Wn. App. 306, 313, 945 P.2d 727 (1997). But a claimant will fail to demonstrate exclusivity if there is evidence of "'use by the title owner that indicates ownership.'" *Id.* (quoting *Bryant v. Palmer Coking Coal Co.,* 86 Wn. App. 204, 217, 936 P.2d 1163, *review denied*, 133 Wn.2d 1022 (1997)). Finally, "[h]ostility requires 'that the claimant treat the land as [their] own as against the world throughout the statutory period.'" *Nickell*, 167 Wn. App. at 50 (quoting *Chaplin v. Sanders,* 100 Wn.2d 853, 860-61, 676 P.2d 431 (1984)).

Adverse possession "does not require establishing a clearly demarcated line." *Riley*, 107 Wn. App. at 396. "[R]ather, the court may project a line between objects where it is reasonable and logical and the claimant's use of the land was open and notorious." *Id.* And "[c]ourts may create a penumbra of ground around areas actually possessed when reasonably necessary to carry out the objective of settling boundary disputes." *Lloyd v. Montecucco*, 83 Wn. App. 846, 853-54, 924 P.2d 927 (1996), *review denied*, 131 Wn.2d 1025 (1997).

In *Lloyd*, the Montecuccos adversely possessed part of the Lloyds' property by, among other things, planting and harvesting trees. *Id*. at 849. The trial court drew a straight line to demarcate the adversely possessed area, and on appeal the Lloyds contended that "the Montecuccos' actual possession would be more fairly represented by a jagged line." *Id*. at 853. This court disagreed, affirming the trial court despite "[n]oting that there is no direct evidence the Montecuccos actually possessed every square yard of the disputed tract." *Id*. "Courts are not required to find a blazed or manicured trail along the path of the disputed boundary; it is reasonable and logical to project a line between objects when the extent of the adverse possessor's claim is open and notorious as the character of the land and its use require[s] and permit[s]." *Id.* at 854.

B.    ANALYSIS

    1.    Beach Area

The Helgrens argue that the trial court's finding that the trees along the northern boundary were not in a straight line and that the Helgrens had not improved the beach do not support the conclusion that the Helgrens did not adversely possess the beach area. The Helgrens assert that they satisfied the elements of adverse possession for the beach area. We agree.

The trial court found that the Helgrens adversely possessed the area within their fence, but not including the beach area between the end of the Helgrens' deck and the dead fir tree. The trial court also found that the stumps and trees that used to form the border between the properties "angle[d] towards the Helgren property and [did] not follow a straight line from the corner of the cyclone fence at the end of the deck to the middle of the dead Douglas Fir tree." CP at 217. "Beyond such line towards the water after the deck and cyclone fence, there were no improvements by the Helgrens." CP at 217.

The Helgrens testified that they maintained the beach area throughout their ownership of their property. Timothy testified that he weeded around the base of the dead tree on the Helgrens' side. He also sprayed the northern trees to keep back weeds before those trees were cut down. And the Helgrens submitted a photo of their family playing at the beach. There was no evidence that anyone other than the Helgrens used and maintained the beach area. Also, the undisputed evidence showed that the Helgrens and Sanders believed the line of trees marked the boundary line between their properties.

The fact that the Helgrens did not make improvements to the beach area is not relevant because actual possession is established through use of "such a character as a true owner would make considering the nature and location of the land in question." *LeBleu*, 193 Wn. App. at 81. Here, the land in question was a beach, which would logically need to be kept clear of weeds and detritus but also not require development. The Helgrens testified that they swam and played at the beach and cleared the south side of the boundary trees of weeds during the adverse possession period. In contrast, Sanders' side of the treeline was a "jungle." VRP at 102.

We hold that the trial court's finding that the Helgrens did not improve the beach is not supported by substantial evidence and, therefore, does not support the conclusion that the Helgrens did not adversely possess the beach area. *Viking Bank*, 183 Wn. App. at 712. To the contrary, the evidence showed that the Helgrens used and maintained the beach area in a manner consisted with its use as a beach and to the exclusion of others, which demonstrates actual possession, hostility, and open and notorious use. *LeBleu*, 193 Wn. App. at 81; *Nickell*, 167 Wn. App. at 50. The Helgrens also established exclusive use for over 10 years: there was no evidence that anyone

15

except the Helgrens and their family used the beach area; Sanders' renters had access to a different beach and dock. *Lilly*, 88 Wn. App. at 313.

Finally, the undisputed evidence showed that the Helgrens and Sanders viewed the line of trees in the beach area as the boundary line. That the trees were not in a straight line is insufficient to support the conclusion that the Helgrens did not adversely possess the beach area. *See Riley*, 107 Wn. App. at 396; *Lloyd*, 83 Wn. App. at 854. Thus, the trial court's finding that the trees were not in a straight line does not support the conclusion that the Helgrens did not adversely possess the beach area. *Viking Bank*, 183 Wn. App. at 712.

We hold that the trial court's findings do not support its conclusion that the Helgrens did not adversely possess the beach area between the Helgrens' deck and the middle of the dead fir tree. Rather, the undisputed evidence showed that the Helgrens exclusively used and maintained the beach area for over 10 years. We remand for the trial court to quiet title to the beach area in the Helgrens' favor.

2.    Parking Strip

Next, the Helgrens challenge the trial court's findings that the Helgrens did not maintain the parking strip in a consistent manner and that the fence post did not exclude anyone from entering the parking strip. The Helgrens argue that their maintenance of the area, whether by mowing grass, planting flowers, or using it for parking, established the elements of adverse possession. We agree with the Helgrens.

At trial, Sherry testified that the Helgrens planted flowers in the parking strip area beginning in 2007. Sherry also testified that no one but the Helgrens maintained that area before Brown moved in, and that the Helgrens never asked permission from anyone to maintain the area.

Timothy referred to the bare area next to Brown's driveway as a "[f]lower bed." VRP at 107 (discussing Ex. 37). Timothy testified that, from when they moved in until about 2021 there had been grass growing in the entire area south of the cyclone fence along the road, which the Helgrens regularly mowed. Brown testified that he had no personal knowledge of the contested areas (the beach or parking strip) from before 2020. There was no evidence that anyone other than the Helgrens maintained the parking strip area. The photos in the record only show the parking strip area after 2018. Thus, the evidence shows that the Helgrens openly and exclusively maintained the parking strip area consistently between 2007 and 2017.

The trial court's finding that the Helgrens did not maintain the parking strip in a consistent manner is not supported by substantial evidence, and the trial court's conclusion that the Helgrens did not adversely possess the parking strip area is not supported by its findings. Rather, the undisputed evidence showed that the Helgrens maintained the parking strip consistently for the requisite 10 year period. We remand for the trial court to quiet title to the parking strip in the Helgrens' favor.

## ATTORNEY FEES

The Helgrens seek appellate attorney fees under RAP 18.1(a) and RCW 7.28.083(3). RAP 18.1(a) authorizes this court to award a party appellate attorney fees if "applicable law" permits. "The prevailing party in an action asserting title to real property by adverse possession may request the court to award costs and reasonable attorneys' fees." RCW 7.28.083(3). "The court may award all or a portion of costs and reasonable attorneys' fees to the prevailing party if, after considering all the facts, the court determines such an award is equitable and just." RCW 7.28.083(3).

No. 60078-1-II

The Helgrens prevail on appeal. Therefore, we award the Helgrens their attorney fees on appeal.

CONCLUSION

We reverse and remand for the trial court to quiet title to the beach area and the parking strip in the Helgrens' favor. We award the Helgrens their attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, C.J.

Che, J.

18